## Griffith, etc. v. Griffith's Exr., et al.

(Decided February 12, 1913.)

## Appeal from Garrard Circuit Court.

1. Adverse Possession—When Widow's Possession is Adverse.—As a general rule, the widow's possession of lands of which her husband died seized before assignment of dower, is not adverse to his heirs, unless it be openly and notoriously declared by her to be held adversely to the title of the heirs.

2. Adverse Possession—Holding by Woman Not Married to Owner is Adverse.—Where a woman lived with a man for many years, to whom she was never married, and he died leaving her and her illegitimate son by him, living upon his land, her possession is not that of his widow, and is adverse to the rights of his legitimate children, who did not live upon the land.

3. Adverse Possession—By One Claiming to Own Land.—In such a case, where the illegitimate son continued to live upon the land with his mother after his father's death, mortgaged it, treated it as his own, and disposed of it by will, his mother not claiming to be the widow of his father, and knowing that she was not his widow, the possession of the son is adverse to the rights of the legitimate children of the father, from the date of the father's death.

W. I. WILLIAMS and JAMES I. HAMILTON, for appellants.

LEWIS L. WALKER, for appellees.

OPINION OF THE COURT, BY JUDGE MILLER.—Affirming.

William Griffith was born in Bath county, Virginia, in 1813; Agnes H. Gilliland was born there in 1817. In 1840, William Griffith married Mary Sophia Ross, also of Bath county, by whom he had five sons and two daughters, namely, Nathaniel, Charlton, Orlando, John William, Hezekiah, Louisa, and Lucy. Nathaniel and Hezekiah are the only survivors. Lucy died without issue; Louisa left a child, while Charlton, John William and Orlando left one or more children.

In about 1852, William Griffith removed with his family from Bath county, Virginia, to Cedarville, West Virginia, where he remained with his family until about 1861, when he abandoned them and returned to Bath county, where he remained until about 1865. He then disappeared from Bath county. Shortly after his departure from Bath county, his wife and son, Nathaniel, went to Bath county for the purpose of ascertaining what had become of the husband and father, William Griffith. They learned that he had resided in Bath county during the whole of

the war between the States, but that he had taken a woman and left that county shortly before the arrival of his wife and son. In the same year of their visit to Bath county, William Griffith reappeared in Cedarville, and remained with his family two or three months. He then left Cedarville and went to Marietta, Ohio. His son Nathaniel found him living in Marietta with Agnes Gilliland, and a man named William Preston Gilliland, and called "Preston," who was her son. Nathaniel Griffith returned to West Virginia, and some two or three years later he again visited his father, who was then living near Covington, Kentucky, with Agnes Gilliland and her son Preston Gilliland. Nathaniel remained in Kentucky with his father some two or three months, working on a railroad, and then returned to Cedarville. Two years later Nathaniel again returned to Covington to visit his father, but failed to find him. He did, however, find Sidney Gilliland, Preston's older brother, living near Covington. Sidney was married, and had three children. He told Nathaniel that his father, William Griffith, was in Rockcastle county, Kentucky, and Nathaniel proceeded to Rockcastle county in search of his father. He found him there, living with Agnes Gilliland and her son Preston, and remained about a month with them. Nathaniel then returned to his home in Cedarville, and never saw or heard of or from his father again during his lifetime. The date of this visit to Rockcastle county, Kentucky, was about 1875.

During the several visits of Nathaniel to his father in Kentucky, his father requested him not to disclose his whereabouts to his wife, Mary Sophia Griffith, promising Nathaniel if he would obey him in this respect, he would give Nathaniel whatever property he had at his death. William Griffith further told his son Nathaniel that he had never married Agnes, and would never do so.

Mary Sophia Griffith died in Virginia in 1885.

William Griffith died in Garrard county, Kentucky, on February 18, 1887. It subsequently appeared that the illicit relation between William Griffith and Agnes Gilliland had begun prior to 1837; had continued practically, without intermission, from that date until his death in 1887, a period of more than 50 years, and that Sidney and Preston Gilliland were the issue of that relation.

Sidney Gilliland, the oldest child of this illicit love, was born in 1837, while William Preston Gilliland, the younger, was born May 29, 1840, about four months after the marriage of his father to Mary Sophia Ross. It does not appear when Sidney and William Preston Gilliland assumed the name of Griffith, but neither they nor their mother had assumed that name in 1863, at which time Preston Gilliland, then a soldier in the Confederate Army, and encamped before Richmond, Va., wrote a letter to his mother; in which he addressed her as "Mrs. Agnes Gilliland," and signed himself as "Wm. P. Gilliland."

Upon their removal to Kentucky, it seems that Agnes Gilliland took the name of Griffith, and during their residence in Kentucky, she went as the wife of William Griffith, and was treated by the public as entitled to that position.

In 1884, William Griffith bought a farm of 100 acres in Garrard county from Miriam Patterson, and he and Agnes and Preston moved upon it, and continued to live there until the father's death in 1887. After his father's death, Preston continued to live upon the farm with his mother, and managed it as he had theretofore done, until her death in 1901. William Griffith had died intestate. In 1891, Preston Griffith bought what is known as the Todd farm for $4,000.00; and subsequently, in 1892, he raised a part of the purchase money by giving a mortgage upon the Patterson farm, which his father, William Griffith, owned at the time of his death. In the mortgage Preston refers to the land which he therein mortgaged as being "the same land conveyed to me by Miriam Patterson." Preston subsequently paid this indebtedness, and seems also to have paid a part of the purchase money of the original Patterson place, which had been conveyed to his father. Preston died on July 28, 1908, leaving a will by which, after making three specific devises aggregating $1,700.00, he gave the remainder of his estate to his brother, Sidney Griffith. He appointed the appellee, W. T. Champ, as his executor, with full power to sell and convey his real estate. The will speaks in general terms, and devises to his brother Sidney "all the remainder of all properties which I own or may own at the time of my death."

On October 17, 1908, this action was brought by the heirs of Sidney Griffith against Champ, executor, to recover the Patterson farm and the Todd farm, and on

March 25, 1910, Nathaniel Griffith and Hezekiah Griffith, uniting with the heirs of the other children of William Griffith by his legal wife, Mary Sophia, filed their cross-petition herein, claiming the Patterson farm as the heirs at law of William Griffith, deceased. The executor defended the title of Preston Griffith to the Patterson farm, under a plea of adverse possession by Preston Griffith since the death of his father in 1887, while the Virginia heirs claim that Preston's adverse holding began only with the death of his mother, Agnes, in 1901. The circuit judge sustained the claim of the children of Sidney Griffith, and dismissed the cross-petition of the Virginia heirs, upon the ground that Preston Griffith had held the title to the Patterson farm "by adverse possession, and the said alleged cause of action set forth in the petition of Nathaniel Griffith and others is barred by the statute of limitations." From that judgment Nathaniel Griffith and the other Virginia cross-petitioners prosecute this appeal.

The claim was originally made that Preston Griffith by his use and occupation of the Patterson farm without rent, before and after his father's death, had acquired the money with which to buy the Todd farm; and the Virginia claimants sought also to recover the Todd farm, for that reason. That claim, however, has been abandoned, and we have here to determine only their claim to the Patterson farm.

As William Griffith, the father, moved upon the Patterson farm in December, 1884, and died on February 18, 1887, he occupied that place only during the two cropping seasons of 1885 and 1886; and, as he was 74 years old at the time of his death, it might be safely assumed, if it were not shown by the evidence, that he did little or no work during the time he lived upon the Patterson farm. Moreover, the evidence shows that he was then weak both in body and mind. Furthermore, it fully appears that Preston Griffith was a man above the average both in ability and energy, and not only supported and maintained his father and mother for many years preceding their deaths, but that he acquired an estate of perhaps $15,000.00 as a farmer and stock trader. He had supplied part, if not most of the purchase money which paid for the Patterson farm. During the lifetime of his father, the farm was assessed against "William Griffith and Son," and Preston paid the taxes. After his father's death, the property was assessed to Preston, and he, of

course, paid the taxes. The defense of Preston's adverse holding is rested upon the fact that during the interval between his father's death in 1887, and the death of his mother, Agnes, in 1901, Preston claimed the farm as his own, and held it adversely to the claim of all others. The substance of the evidence in support of this claim is, that being the active business man, both before and after his father's death, he assumed the control and management of the farm, paid the taxes as above indicated, and made a mortgage upon the farm for $1,000.00 in 1892 claiming it as his own. What then was the extent and character of his holding? If it was adverse from the death of his father in 1887, limitation barred the appellants' claim when they filed their petition on March 25, 1910; but, if it was adverse only from the death of his mother in 1901, appellants are not barred.

Appellants contend that after the death of William Griffith in 1887, Agnes, and not Preston, continued to hold the farm until 1901, as she had the right to do, as widow, since dower had not been assigned to her. Appellee answers this claim by showing that Agnes was not the widow of William Griffith; had no right to dower, and never claimed it; while the appellants in reply would avoid this defense by showing that although Agnes was not the lawful widow of William Griffith, her holding was amicable, and not hostile to the rightful heirs.

Appellants rely upon Bush v. Fitzgeralds, 125 S. W., 716, to defeat the claim of adverse holding. That case re-affirmed and applied the well-established general rule that the widow's possession of lands of which her husband died seized, before assignment of dower, is not adverse to his heirs, unless it be openly and notoriously declared by her to be held adversely to the title of the heirs. Driskell v. Hanks, 18 B. M., 855; Frazier v. Naylor, 1 Met., 593; Clayton v. Clayton, 11 Ky. L. R., 492, 12 S. W. 312; Hulvey v. Hulvey, 92 Va., 182; Hall v. Mathias, 4 W. & S., 331.

If, however, Agnes was not the widow of William Griffith, does the rule apply?

In reply to the appellee's answer that Agnes Griffith was not the widow of William Griffith, and that her holding was, therefore, illegal and hostile to that of appellants', appellants rely upon Lindsey's Devisees v. Smith, 131 Ky., 176, as concluding the question in their favor. The facts of that case were these. Dock Smith was a negro, born of slave parents, who were married after the

manner of slaves. His mother died, and his father, Alfred, again married before the adoption of the Thirteenth Amendment to the Federal Constitution, which abolished slavery in Kentucky. After the war between the States, Alfred Smith continued to live with his last wife, without having legitimized the issue of his marriage, or legalized the relation of husband and wife, which had been assumed by man and woman while in slavery and continued after their freedom, as is provided may be done by the Act of 1866. In the meantime, Alfred Smith bought the land in controversy, and lived upon it until his death; and after his death, his widow rented out the property. Lindsey bought the interests of the two children by the last wife, in ignorance of Dock Smith's parentage, or claim of title; and upon the death of the widow Dock Smith brought his suit against Lindsey to recover one-third interest in the land. After determining that Dock Smith's father and mother had married while slaves, and that his three children, including Dock, inherited from him, the court passed upon the second wife's claim of adverse possession, as follows:

"As both of Alfred's marriages had been contracted during slavery, and were after the custom of slaves, the statute as to right of inheritance by former slaves was operative alike upon all of his issue of both marriages, and his three children inherited from him after his death, the appellee taking an undivided third.

It is contended by appellant that appellee's right is barred by the statute of limitations; it being asserted that those under whom she claimed had been in the actual adverse possession of the lot for more than 15 years before this suit. The proof is that the widow of Alfred, although she and he had not filed the declaration provided by the act of February 14, 1866, and therefore not his widow in law, continued to claim and assert title to the homestead as widow only until her death. Her claim then was not adverse to his children, but, although unfounded in law, was in fact amicable to their title. Mr. Lindsey bought subject to her claim, and acted as her agent in renting her property. So his claim and acts of ownership were not adverse to appellee or to Alfred's children. The statute does not apply because the character of the possession was in fact not such as set it running notwithstanding it might have been."

It will be noticed that Alfred's wife thought she was

his widow, and claimed as widow. It was that claim which, under the general rule, rendered her possession amicable, and not hostile, to the title of Alfred's children.

But the facts in the case at bar are radically different. Here, Agnes knew she had never been the wife of William Griffith, and could not, therefore, be entitled to the rights of a widow. She knew that Mary Sophia of Virginia was the lawful wife of William Griffith, and entitled to the rights of his widow, after his death in 1887. These facts necessarily changed the character of her possession from the amicable one of a widow, to a hostile holding by one having no lawful claim or title. So much may be said as to her holding which, of course, began upon the death of William Griffith in 1887. But it is claimed, and the proof sustains the claim, that the possession was in Preston after his father's death in 1887; and his possession was certainly adverse to the rights of appellants.

It is therefore immaterial whether the adverse holding be based upon the possession of Agnes or that of Preston, or the two jointly, since in either case it was hostile to appellants from 1887, and was barred by the statute of limitations when appellants first asserted their claim in 1910.

Judgment affirmed.